139 F.3d 906
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Benita MOORE, Plaintiff-Appellant,
v.
SECURITY-CONNECTICUT LIFE INSURANCE COMPANY, Defendant-Appellee.
 No. 96-17092.
DC No. CV-95-3681-WHO/JBS.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Nov. 6, 1997.
Decided Feb. 19, 1998.
 
 Appeal from the United States District Court for the Northern District of California. William H. Orrick, District Judge, Presiding.
 Before WOOD, Jr.** , RYMER, and TASHIMA, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Benita Moore ("Moore") brought this diversity action, governed by California law, against the Security-Connecticut Life Insurance Company, ("Security") after it denied her claim for benefits under a life insurance policy (the "Policy") issued to Joseph Shea ("Shea"), who was both Moore's husband and a Security agent. Shea died leaving Moore the beneficiary of the disputed policy's benefits. Moore sought the policy proceeds from Security but they refused to pay claiming the policy never became effective because Shea had experienced a change of health prior to the payment of his first premium on the Policy. Moore sued Security for the Policy's proceeds. The district court granted Security's motion for summary judgment and Moore appeals. We agree with the district court's analysis finding the Policy ineffective because the first premium payment was not made prior to Shea's change in health and resulting increased mortality rating, and, therefore, we affirm.
 
 I. BACKGROUND
 
 3
 In a light most favorable to Moore, the facts are as follows. Shea became an agent for Security in July 1993. On July 29, 1993, Shea completed an application for life insurance on himself with Security. As part of the application process, Shea was required to have a physical examination and blood and urine testing. The physical exam was conducted by a paramedical technician and not a medical doctor. Shea was also required to authorize disclosure of his medical records. Shea's examination and testing results were satisfactory for the issuance of a Security life insurance policy.
 
 
 4
 Security mailed a $250,000 policy to Shea on October 6, 1993, which indicated a policy anniversary date of October 11, 1993. The front page of Shea's policy also contained the following statement: "[w]e promise to pay the Death Benefit to the Beneficiary subject to the provisions of this Policy." In the "General Provisions", under the section "THE CONTRACT", the policy states: "[w]e issue this Policy in return for the written application and the payment of the first premium." Relevant "General Provisions" under the section "PAYMENT OF PREMIUM" provide:
 
 
 5
 PAYMENT OF PREMIUMS: Your first premium must be paid when your Policy is delivered. All premiums after the first premium are payable on or before the date they are due and must be mailed to us at our Home Office or paid to an authorized agent ....
 
 
 6
 ....
 
 This Policy shall not take effect:
 
 7
 1. Until the Policy has been delivered to you.
 
 
 8
 2. Until you pay the first premium as above during the Insured's lifetime; and
 
 
 9
 3. If the Insured's health as shown in the application has changed so as to increase the mortality rating or risk before delivery and payment as above are complete.
 
 
 10
 On November 21, 1993, Shea wrote and mailed a check (No. 201) for $140.30 to Security for the first premium payment. Security stamped "RECEIVED NOV. 29, 1993," and negotiated Shea's check on November 29, 1993.[1]
 
 
 11
 In September 1993, Shea began experiencing difficulty swallowing. Following a series of ineffectual treatments, on November 5, 1993, Shea underwent an esophagram which revealed a stricturing lesion in the distal esophagus. Medical records on this date, regarding possible diagnosis, reveal the examiner's belief that esophageal carcinoma was a somewhat less likely diagnosis than either reflux esophagitis with ulceration or Barrett's esophagus. Following a November 22, 1993, biopsy, Shea was told he had adenocarcinoma, cancer, on November 23, 1993. Shea died from his cancer on December 5, 1994.
 
 
 12
 On December 20, 1994, Moore phoned Security to notify the company of Shea's death from cancer. The next day, Security wrote to Moore explaining that since Shea had died within two years of the October 6, 1993 issue date, his death fell within the contestable period of the policy and that Security would conduct a routine investigation. On March 30, 1995, Security informed Moore that her claim was denied because "the policy was not placed during the continued good health of Mr. Shea ...."
 
 
 13
 On August 18, 1995, Moore filed this suit against Security. Her complaint alleged five causes of action against Security: (1) breach of contract, (2) bad faith breach of duty to indemnify, (3) breach of fiduciary duty, (4) intentional infliction of emotional distress, and (5) negligent infliction of emotional distress. The district court granted Security's motion to dismiss Moore's breach of fiduciary duty claim. Moore does not challenge that decision on appeal. The district court then granted Security's motion for summary judgment dismissing the suit in its entirety. After the district court denied her motion for reconsideration, Moore filed this timely appeal.
 
 II. ANALYSIS
 
 14
 This diversity action, governed by California law, involves issues of insurance contract interpretation. At issue here is whether Shea's Policy with Security became effective prior to his November 23, 1993, change of health.[1] Security asserts, and Moore does not dispute, that under California law good health clauses are valid and enforceable. See American National Ins. Co. v. Herrera, 211 Cal.App.2d 793, 800, 27 Cal.Rptr. 641 (1963). Thus, Moore does not argue that the Policy provision, requiring no change in mortality rating until payment of the first premium, is unenforceable. Rather, Moore raises a number of arguments in support of her position that the Policy became effective prior to November 23, 1993; the date Shea was diagnosed with esophageal cancer.
 
 
 15
 We review the district court's grant of summary judgment de novo. Cisneros v. Unum Life Ins. Co. of America, No. 95-56179, 1998 WL 19547, at * 1 (9th Cir. Jan.20, 1998). The district court's determination of whether Policy language is ambiguous is reviewed de novo. Id. Finally, we review the district court's interpretation of the Policy language de novo. Id.
 
 
 16
 Although summary judgment is normally appropriate unless issues of material fact exist, Moore does not ask us to reverse the district court's grant of summary judgment because there remain issues of material fact. Rather, Moore argues that the trial court misapplied California law with respect to the Policy. Moore concludes that, although summary judgment is proper, it should have been rendered in her favor.
 
 
 17
 Moore raises several arguments in support of her position that, as a matter of law, the Policy became effective prior to Shea's diagnosis with cancer. Specifically, Moore argues, in the alternative, that the Policy became effective on either October 6, 1993, or November 21, 1993. According to Moore, the district court erred as a matter of law in finding the Policy ineffective on either of these dates. We address each of Moore's contentions in turn.
 
 A. Delivery of the Policy
 
 18
 Initially Moore argues that the Policy became effective as early as October 6, 1993, for two reasons: (1) Security unconditionally delivered the Policy to Shea on October 6, 1993, and (2) even if it was conditional, Security is estopped from denying coverage because the Policy itself impliedly acknowledges that the premium had been paid. We must reject both of these arguments.
 
 1. Effect of Policy Delivery
 
 19
 First, Moore contends that the Policy was unconditionally delivered to Shea. Therefore, Moore reasons, under California law the Policy became effective at the time of delivery. In support, Moore points to several California cases in which delivered insurance policies became effective despite policy language purporting to require actual payment first. See Raulet v. Northwestern National Insurance Co., 157 Cal. 213, 107 P.2d 292 (1910); Farnum v. Phoenix Insurance Co., 83 Cal. 246, 23 P. 869 (1890); and Negvesky v. Alston, 152 Cal.App.2d 66, 312 P.2d 728 (1957). We find these cases unpersuasive because they involve situations where the insurance company impliedly or expressly extended a credit to the insured for the initial premium. See e.g. Raulet, 107 P.2d at 296 (Finding that the language "in consideration of twenty-four dollars premium" could be ambiguously construed as agreeing to extend credit to the insured). That is clearly not the case here. The "General Provisions" of the Policy, under the category "PAYMENT OF PREMIUM," provide: "Your first premium must be paid when your Policy is delivered." The explicit language does not permit an inference that Security intended to extend credit. Moore simply failed to present any evidence that Security intended to extend credit to Shea for the first premium.[2]
 
 
 20
 The Policy was not unconditionally delivered to Shea. Security plainly provided that the Policy was to be ineffective until Security received Shea's first premium payment and, until payment was received, Shea's remaining in good health. There is no evidence in the record suggesting it was Security's intent, either express or implied, to extend credit to Shea. Express language in the Policy conditions its effectiveness on three conditions precedent: (1) delivery of the Policy; (2) payment of the first premium; and (3) that Shea remain in good health until the first two conditions were met. Thus, mere delivery of the Policy met only one of the three requirements necessary for the Policy to become effective.
 
 2. Policy Language Estoppel
 
 21
 Next, Moore contends that, even if the delivery was conditional, Security is estopped from denying coverage because language in the Policy, stating "[w]e issue this Policy in return for the written application and the payment of the first premium," impliedly acknowledges receipt of the premium payment at the time of delivery. Although acknowledging that payment was not made at the time of delivery, Moore contends that, pursuant to California Insurance Code § 484, Security is estopped from denying that the Policy was in force. Section 484 states:
 
 
 22
 An acknowledgment in a policy of the receipt of premium is conclusive evidence of its payment, so far as to make the policy binding, notwithstanding any stipulation therein that it shall not be binding until the premium is actually paid.
 
 
 23
 Moore also relies on two California cases to support her estoppel theory, Sawyer v. State Farm Fire & Cas. Co., 69 Cal.2d 801, 803, 73 Cal.Rptr. 232, 447 P.2d 344 (1968), and Palmer v. Continental Ins. Co. Of New York, 132 Cal. 68, 64 P. 97 (1901). However, both are easily distinguished from the present case because in each the policy at issue contained an express provision acknowledging payment. In Sawyer, the relevant provision stated that the Policy was issued "... [i]n consideration of the premium paid." 69 Cal.2d 801, 73 Cal.Rptr. 232, 447 P.2d 344. In Palmer, the relevant provision stated that the insurer issues the policy "in consideration of twelve dollars paid." 132 Cal. 68, 64 P. 97. These two provisions refer to amounts paid and are readily viewed as acknowledging prior payment. However, the recital in the Policy at issue here cannot be read as an acknowledgment of payment, particularly where other Policy language states that the Policy shall not take effect "... until you pay the first premium." Moreover, Moore's argument is somewhat disingenuous since Shea, an experienced insurance agent, filled out an application which stated: "... no policy shall take effect unless, during the lifetime and continued insurability of the Proposed Insured, the Agent has delivered the policy to the Owner, the Owner has accepted it, and the first premium for the policy has been paid...."
 
 B. Payment by Check
 
 24
 Alternatively, Moore argues that the Policy became effective on November 21, 1993, because that is when Shea actually wrote and mailed a check for his first premium. Moore sets forth two alternative rationales for this position. First, Moore contends that under the California "mail box rule" payment was made when the check was sent to Security. Alternatively, Moore contends that even if the mail box rule is inapplicable, Shea was authorized to collect the initial premium of his own Policy on behalf of Security because he was a Security agent and, thus, payment was made when he wrote and accepted his check on behalf of Security.
 
 
 25
 1. The "Mailbox Rule"
 
 
 26
 The crux of Moore's "mailbox rule" argument is that the Policy term "payment" is ambiguous. According to Moore, payment can mean either "conditional" or "absolute" payment. Since the term "payment" is undefined in the policy and tendering a check is conditional payment, Moore concludes that, when construed in her favor, the mailing of Shea's check constituted "conditional" payment, subject to successful negotiation by Security.
 
 
 27
 While acknowledging that the Policy contains a clause providing that the "first premium must be paid when your Policy is delivered," Moore argues that the term "payment" is ambiguous because it could mean either "conditional" payment or "absolute" payment. Since established principles of insurance contract interpretation require such ambiguities to be resolved against the insurer, Moore concludes that the trial court improperly used the "absolute" payment interpretation in ruling for Security. However, Moore's argument is flawed because the district court correctly found that there was no ambiguity in the contract term "payment."
 
 
 28
 It is well settled law in California that the payment of a debt by an uncertified check is a conditional payment that depends upon the successful negotiation of the check by the creditor. Cornwell v. Bank of America, 224 Cal.App.3d 995, 1000, 274 Cal.Rptr. 322 (1990). In Hale v.. Bohannon, the California Supreme Court, sitting en banc, stated that a check is not "payment" until cashed unless "the party attempting to prove payment by mere delivery or acceptance" goes further and "prove[s] that such delivery and acceptance was in accordance with an agreement that it was to be accepted for payment." 38 Cal.2d 458, 241 P.2d 4, 9 (Cal.1952). Since Moore presented no evidence that an agreement existed between Shea and Security, in which Security agreed to accept a check as payment, the district court correctly determined that the term "payment" required the Security to successfully negotiate Shea's check.
 
 
 29
 Although Moore can point to no case law supporting her argument, she argues that the California's mailbox rule, embodied in Civil Code § 1583, should be applied to these facts, making the date of payment the date Shea mailed his premium check. California Civil Code § 1583 states that "[c]onsent is deemed to be fully communicated between the parties as soon as the party accepting a proposal has put his acceptance in the course of transmission to the proposer, in conformity to the last section." Moore relies on this provision to support her contention that when Shea deposited his check in the mail, on November 21, 1993, "payment" was complete. Unfortunately, Moore fails to acknowledge or address the last provision of § 1583 which makes its application subject to the previous section of the Civil Code, § 1582. Civil Code § 1582, which codifies common law doctrines for communicating contract acceptance, states:
 
 
 30
 MODE OF COMMUNICATING ACCEPTANCE OF PROPOSAL. If a proposal prescribes any conditions concerning the communication of its acceptance, the proposer is not bound unless they are conformed to; but in other cases any reasonable and usual mode may be adopted.
 
 
 31
 When § 1583 is read in conjunction with § 1582, as the last clause of § 1583 requires, it is apparent that the "mailbox" rule is applicable only where the "proposal" does not prescribe conditions concerning the communication of its acceptance. Since payment was a precondition for Shea's acceptance of Security's life insurance policy, Moore cannot avail herself of § 1583 even if this court were to find it applicable in this case. Moreover, as the district court insightfully points out, applying the "mailbox" rule to payments by mailed check would be inconsistent with the general rule in California that a check is not paid until it is honored by the bank.
 
 2. Dual Role as Insured and Agent
 
 32
 We now turn to Moore's argument that as an agent of Security Shea was authorized to collect his first premium check from himself on behalf of Security. According to Moore, the Policy explicitly, or at least impliedly, allows the initial payment to be either sent to Security's main office or to a Security agent. Since Shea was a Security agent when he wrote his check and simultaneously accepted it on behalf of Security Moore concludes that payment was made on November 21, 1993.
 
 
 33
 Although this issue appears one of first impression in California, Moore urges us to apply the general rule that a "premium" is paid for purposes of binding coverage when it is tendered to an agent authorized by the insurer to receive payment or to the producer if so authorized by the policy. See Guerin v. Cal. Western States Life Ins. Co., 229 Cal.App.2d 325, 329, 40 Cal.Rptr. 344 (1964); Frasch v. London & Lancashire Fire Ins. Co., 213 Cal. 219, 222-23, 2 P.2d 147 (1931). We find those cases unpersuasive because in neither of those cases was the agent himself also the insured.
 
 
 34
 When acting under diversity jurisdiction, we must attempt to decide the case as the highest court of the state supplying the law would do. Although the California Supreme Court's position is unclear, we think that that court would decline Moore's invitation to apply the general rule in situations where the agent is itself the insured. See Federal Kemper Ins. Co. v. Preston, 520 F.Supp. 24 (E.D.Tenn.1981) (Declining to extend the general rule where agent is also the insured). Application of the general rule, absent an express agreement to the contrary, to these facts invites fraud.
 
 
 35
 Moreover, the Policy language at issue here does not support Moore's argument. The Policy states: "All premiums after the first premium ... must be mailed to us at our Home Office or paid to an authorized agent." We agree with the district court when it states: "[c]ommon sense dictates that insurance payments may always be mailed to the insurance company's home office. Thus, the first premium is an exception to the rule, and may only be mailed to the home office."
 
 
 36
 Although Security argues that the Policy is ineffective because Shea's actual physical health changed placing him in a higher mortality rating or class of risk before he satisfied conditions precedent to the contract, we do not address that issue since it is unnecessary to the resolution of this dispute and raises issues of material fact.[3]
 
 
 37
 We agree with the district court that Shea's failure to pay the first Policy premium prior to his change in health rendered the Policy ineffective. Furthermore, the district court did not abuse its discretion in denying Moore's motion for reconsideration because the court found Moore's proffered evidence irrelevant given the Policy's unequivocal requirement of prior payment. Once the court found the Policy requirements unambiguous, it was not an abuse of discretion for the court to disregard Moore's expert's testimony, attempting to introduce ambiguity. Moreover, we find no merit to Moore's contention that a declaration from a Security employee, Paul Thorndal, provided evidence of Security's intention to extend Shea credit.
 
 III. CONCLUSION
 
 38
 For the foregoing reasons we AFFIRM the decision of the district court, granting summary judgment in favor of Security.
 
 
 
 **
 The Honorable Harlington Wood, Jr., United States Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36-3
 
 
 [1]
 Although Moore disputes that the check was actually received on that day, she has produced no evidence to contradict Defendant's accounting journal for the months of October and November 1993 showing an entry date of Shea's check, No. 201, on November 29, 1993
 
 
 [1]
 Security concedes a November 23, 1993, change of health solely for purposes of this appeal
 
 
 [2]
 Although Moore argues that documents attached to the declaration of Paul Thorndal suggest Security intended to extend credit to Shea for the first premium payment, she neither includes a copy of the purported documents nor does she point to any particular statement that could be construed as contemplating an extension of credit
 
 
 [3]
 Despite Moore's assertions to the contrary, we find the "good health provision" in American National Ins. Co. v. Herrera, 211 Cal.App.2d 793, 27 Cal.Rptr. 641 (1963), analogous to the no change in "mortality rating or class of risk" at issue here. In Herrera, the court ruled that the good health clause required actual good health at the time the policy issued where the insured had not submitted to a medical examination prior to issuance. Whether Shea's physical examination by a paramedic constituted a medical examination is unclear and must be resolved another day